for the appellant, Ms. Green. And for the appellant, Mr. Turner, you may proceed. Good morning. I'm Ellen Green for the Plaintiff Appellant, Chester Bross Construction Company. The first issue that I'd like to address is the one that was raised by IVAD in its response brief, and that's whether this appeal is moot since the two-year suspension that Chester Bross is appealing expired in June 2013. This Court should consider this appeal under two recognized exceptions to the mootness factor, and that's the public interest exception and the collateral consequences exception. And this case isn't simply about whether IVAD properly suspended Chester Bross, but it's whether the suspension is an administrative decision that is subject to judicial review in the first instance. And it's also about what it means to participate in an apprenticeship program in order to be considered a responsible bidder to enter into contracts with IVAD. And these are issues that affect more than the parties here. It affects any contractor that may be doing business with IVAD. It's not a rare or isolated incident, and it's likely to recur. We attached in our reply brief just some examples of other interim and final suspensions that were entered against other contractors with issues relating to the responsible bidder provision, RL Brink, AC Pavement, North Suburban Asphalt. Also, this suspension was the result of a consolidated hearing with two other contractors who also had responsible bidder provision issues, Glen McCann, Road Oil. And we believe there's other suspensions out there. There's some listed on the IDOT website. So this isn't an isolated type case. And there's also interest in this case as reflected by the fact that in the trial court, the trial court accepted an amicus brief from the Illinois-Indiana-Iowa FFC. It's a non-profit labor management organization in which this organization took the position that Chester Bross's interpretation of what it means to participate in an apprenticeship program was consistent with our understanding in that you were a member of an apprenticeship program and did not have to have active participation at the time or have somebody enrolled or graduated, but just that it's available that as you needed that you can send your members there for training. Because we're dealing with a state purchasing issue, we also believe this is just of interest to the general public in that it would allow there to be a larger pool of qualified bidders to bid on state projects. And Review Now, even though the suspension has expired, would provide some guidance to IDOT as to whether its suspension determinations are subject to judicial review and also whether they need to promulgate rules if they are applying an interpretation of participation as a general standard to these type of contracts. The collateral consequences exception also applies to Chester Bross. IDOT claims, since the suspension has expired, that Chester Bross already got the relief it sought in that it's now able to bid on IDOT contracts, but that's not the only relief that Chester Bross is seeking. This suspension was for lack of integrity and honesty and it's something that now has sort of tainted its record. It wants the suspension reversed. So this could affect its ability to get contracts in the future with IDOT. What evidence is there in the record of that being true? Well, since this came up after the suspension was entered into, we haven't made a record. Perhaps that is something proper that we could do on remand. At the time this case went to the trial court, this would have been I think August 2012, approximately a month after the final determination was made. At the time it went to the trial court, it wasn't moot and it was only mooted after we filed the appeal in this court. But you don't have to have evidence of actual injury for the collateral consequences exception. It's enough that there's a threat of future injury and we cite cases to that effect in one case in the reply brief. How big an operation is Chester Bross? Honestly, I don't know how many employees it has and I don't recall seeing that in the record. Just judging from, I'm guessing, well I won't even guess, I'll speculate. I don't think it's a huge operation. It's out of Missouri. So I can't really provide an accurate count as to that. But for those reasons, we'd ask that this court consider the appeal and not dismiss it as moot. Assuming that the court will consider the merits, the first issue is really a simple one and that's whether the trial court erred in refusing to consider the merits. Because the trial court believed that the suspension was an act of executive discretion. And this issue can be considered de novo because it's a question of law when it's the extent to which an agency decision is reviewable. And here the trial court equated the suspension with a decision to award or deny a contract. It says the court finds the authority to grant a state contract is a discretionary act vested in the executive branch of the government. The plaintiff has no right to a state contract. The court will not substitute its judgment for that of the executive state agency. And IDOT makes the same characterization. It says in its brief that they called the suspension a decision not to award a contract for a specified amount of time. In this case, oh, we suspended you for two years but it's really just we're deciding not to award you a contract for two years. And it's clear that under the Illinois Procurement Code and the Administrative Code together that suspensions are treated differently. In the Administrative Code, I think it's part 500, there's an entire separate section governing suspensions. There are other subparts that govern the bidding process and the issuance of contract awards. There are also standards provided in the Administrative Code and the Procurement Code. And it's the standards that make this decision of the Chief Procurement Officer to suspend Chester Bross reviewable. And we've outlined those in our briefs. Suspensions can only be imposed for the causes that are identified in the code and in accordance with procedures that are set forth in the code. They must be based on adequate evidence that the contractor engaged in conduct that's prescribed by the code. And it also provides some general guidelines as to how to assess what is adequate evidence. And in addition to it being subject to certain standards, the CPO's decision was a result of an adjudicatory proceeding. There was, in this case, a hearing that lasted seven days. There were closing arguments, witnesses. The hearing officer made findings of fact and recommended conclusions of law. And then the CPO issued its decision based on those findings and recommendations. Because this is both adjudicatory in nature and there are standards, such as there being a, having to be a cause identified in the code, that the trial court erred in believing that it didn't have the ability to review what it considered was a totally discretionary act to award a contract. So if this court finds that the trial court erred in refusing to review the merits of the case just based on its erroneous belief that a suspension was not reviewable, this court could, at this point, reverse and remand and ask the trial court to consider the case on the merits. Alternatively, this court can review the merits if it chooses to do so. If this court does review the merits, we believe that a clearly erroneous standard applies because the issues involve mixed questions of law and fact as to what it means to participate in an apprenticeship program and then having to determine what that standard is, applying that standard to the facts that were developed in the hearing of this matter. Here are the alleged misrepresentations that were made by Chester Bras. They stem from a certification that Chester Bras submitted as part of its bid proposal. The certification language is, the bidder certifies that it is a participant, either as an individual or as part of a group program, in the approved apprenticeship and training programs applicable to each type of work or craft that the bidder will perform with its own forces. Chester Bras doesn't identify what types of workers that will be used on the project and it doesn't request that the bidder identify those, but Chester Bras simply states that it's a member of the Associated Builders and Contractors Illinois and it attaches certain documentation such as a certificate of registration of the apprenticeship program of ABC Illinois. And identifies the trades for which this program is registered, which includes heavy equipment operators, but it does not include a separate trade of laborers. In these documents, Chester Bras did not represent that this program included the trade of labor, laborer, or that it would be using laborers on this project. But at the hearing, it did offer documents from ABC Illinois that describes the program that it has for heavy equipment operators and that program as well as some of the other programs include sort of a basic skill set which would encompass some of the things that laborers do like work with simple tools and that sort of thing. So it's possible that you could have somebody who is a heavy equipment operator on a paving project who may stop and perform some sort of function like if you spilled some asphalt on the road, use a shovel to clean it up without becoming the trade of laborer. And IDOT, which admitted that it had the burden of proof to show that Chester Bras made a material misrepresentation as to the type of work that it would perform on the project and its participation in an apprenticeship program, it didn't introduce any evidence at the hearing as to the work that was actually performed on the project. So for that reason alone, IDOT could not establish that Chester Bras misrepresented the work that was performed on the Adams County project or that it needed to participate in a laborer apprenticeship program. IDOT also alleged that Chester Bras misrepresented its participation in the apprenticeship program for heavy equipment operators and Chester Bras has consistently stated in the documents it submitted in its bid and then there was some later correspondence from counsel for Chester Bras stating that it was relying on its membership. In ABC, Illinois, as evidence that this was its participation in the apprenticeship program. It never stated that it actually had somebody enrolled or that it actually had a graduate. And this is consistent with the understanding of the organization that submitted the amicus brief that you don't actually have to have someone enrolled because your needs at the time may not require you to have someone enrolled. You may require training for a particular trade. If you're a smaller company, let's say you have ten heavy equipment operators, they may be experienced. You may not have the need to send somebody to an apprenticeship program. So we believe you could consider this amicus brief that was submitted in the trial court as consideration of what a reasonable interpretation of participation means. But IDOT considered that Chester Bras made a material misrepresentation because its understanding of the term participation didn't comport with Chester Bras' understanding. And the problem with that is they didn't have any sort of rule or definition of what participate means. And they never, they're saying this is not a rule that they're just applying the statute to the facts, but what they really did was create a standard that they apply in different cases to, and there was testimony from people at IDOT. The counsel as to how their understanding developed and how they applied this as their meaning to individual cases. But it never went through the rulemaking process which would allow some opportunity for public comment to bring up issues like, well maybe you don't need to have anybody trained at any particular time. Because this was based on an invalid rule that was never promulgated, the suspension should be reversed because Chester Bras could not have misrepresented its participation when its understanding of the term participation didn't include active enrollment in a program. Wouldn't we only be reviewing the decision to determine whether it was arbitrary, capricious, or clearly erroneous like you stated the standard of review was? Yes, but the trial court, that's correct, and we believe that it's a clearly erroneous standard at this point because there was no evidence to support an actual, the work actually performed at the Adams County project. But there was a change in the payroll. For example, they had labeled a couple of people as laborers and then went back and changed that. And they were working on two different sites in the area and had laborers working on those projects. And so I think that the hearing officer took from that that there was some attempt to cover up at least. And I'm not sure his decision could be called irrational based on the record that he had. I think under the clearly erroneous standard if the court's firmly convinced that they made an error in here, it's because it all goes back to the responsible bidder provision. And the representation that the work that Chester Bras is going to be doing on a project is work that's covered under an appropriate apprenticeship program. And here, and this assumes again, and this is more of a question of law, what participate means, there's nothing to suggest that even if a heavy equipment operator was doing something that a laborer might do, that that wasn't covered under the heavy equipment operator apprenticeship program. But did they have anybody enrolled in that program? Actually enrolled, other than being a member of this association? There was no membership in an organization that provided an apprenticeship program for a laborer. But there's also no evidence that Chester Bras was using anybody in the trade of laborer, which might include some, like, traffic control. And perhaps this was a job that didn't require the operators to have to close off a road. When you say there was no evidence, there was evidence that they had paid two people as laborers. At least two, maybe three. There might have been three. That is correct. There was a pay stub or a pay record for a single pay period where these individuals who I think in the other time periods were paid as heavy equipment operators, that this came up and this was for purposes of the prevailing wage act requirements that they have to comply with. That was corrected after it was discovered they had produced a pay, actual paycheck, which I admit it couldn't be altered for one of the employees. The other employees, they didn't have the paychecks because they were paid by direct deposit. So there was a record reflecting that these additional amounts for the difference in pay was submitted, paid to these employees. Correct. My time is running out. We would ask that it reverse the trial court's order that quashed the writ and reverse the final suspension determination from July 5, 2012, or alternatively we would ask that the court reverse the trial court's order and remand for further proceedings. Thank you. You'll have additional time for rebuttal. Mr. Turner. Good morning, Your Honors Counsel. May it please the Court, I'm Christopher Turner, the Assistant Attorney General here on behalf of the State Defendants at Belize, Illinois Department of Transportation, its Secretary, its Chief Procurement Officer, and its Hearing Officer. I will start by addressing the first issue, the threshold issue of mootness. No one disputes that the challenge suspension has expired and that Chester Bross is now eligible to freely bid on contracts. The question that Chester Bross raises is whether or not any of the issues they raise on appeal fit into two of the exceptions to the mootness doctrine, the public interest exception and the collateral legal consequences exception. Our position is that neither applies and therefore the case should be dismissed as moot. In order to meet the public interest exception, Chester Bross must clearly demonstrate that each of the issues clearly meets each of the three elements and here we don't think that their issues meet any of the elements. This doesn't involve a matter of extraordinary or broad public interest. This is ultimately an individual dispute between IDOT, the Chief Procurement Officer, and a contractor. With a factual, fact-intensive dispute about whether or not they met the procurement code requirements and whether or not they engaged in material misrepresentations in their communications with IDOT. This contrasts with the kind of issues which are usually fit within this exception such as challenges to the electoral process, candidacy, involuntary commitment of juveniles. Does this case deal with what participation means? It does. That is one of the sub-issues in how participation applies to the facts of this case. Well then, isn't every business entity that would be enrolled in such a program or choosing to enroll in such a program to satisfy certain criteria for state bids, don't they want to know what participation means? Well, yes, and they would want to know that it is the application of participation specifically to Chester Bross and the way they try to meet participation is simply by having membership with a sponsor organization. To that extent, when answering that question, there would still only be a fairly narrow category of construction contractors who bid on IDOT contracts. That's who it would still apply to. Well, does broad public concern mean the number of people that it affects or does it have something to do with the dollars that are expended on state contracts? Usually it has to do with the broad concern for the number of people, yes. I haven't really ever seen it put forward in terms of pure money. I have a broad concern about how tax dollars are used. As a citizen, that doesn't suggest I'm bringing the case, but it means that there ought to be a broad level of concern for how these bids are awarded and what you have to do to meet the criteria, and therefore, what does participation mean if that's one of the criteria? Yes, it's true, but usually, for instance, with the tax, I don't know of any cases dealing with the tax issue and this exception, but it would sort of fit within it, usually because we already have a broad level of concern. We're all subject to the taxes, and so it broadly applies to all of us. Sort of like the other case they cite, the Sando case, it was the anti-SLAPP statute, and the court there, when it found that a public interest exception applied, it was concerned very much. It went over the public policy involved with the anti-SLAPP statute and the fact that it affects all of us because any entity or individual who might raise a claim. But it also has to meet the other two exceptions as well. It would have to meet that there's a need for authoritative determination. Usually, that's because there's a disarray in the law or some sort of conflict in the law, which there isn't any here. Or also, the third issue is the likelihood of future recurrence of the same question. And they, Chester Brostad, attached these examples to support, on their side, the application of public interest exception. There have been other suspensions. Not so much the ones they attach. I don't think they have to do with participation. They have to do with the labor question about whether or not there was the use of laborers and participate with laborers. Although, if you look closely at those exceptions, they just really confirm that they are each fact-intensive issues. As I think came across in the prior argument, Chester Brostad's primary dispute with the CPO's decision on their use of laborers is they characterize it as that there's no evidence in the record at all to support that they use laborers. That is, we disagree that there is evidence, but the evidence has to do with Chester Brostad's own documents and identifying their workers as laborers. These other cases involve very different types of evidence and very different types of issues. Two of them, if you look at the documents they attach, involve investigations with affidavits and photographs looking directly at all the types of tasks that were being done on the job. The third one, the North Suburban Asphalt Maintenance case they attach, had to do with the CEO or president of that company giving extensive testimony about the specific tasks that were being used on the job. That's the testimony that was central to the decision. In contrast here, their only witness that they put forward, the CEO, Mark Brostad of Chester Brostad, disavowed any knowledge of the concrete tasks or specific tasks that were going on at the site. Their examples just illustrate the fact-intensive nature of the issues here. Nor does this meet the collateral consequences exception. They don't cite any cases to show that it's a speculative concern that a suspension or any kind of disciplinary action would somehow might affect them in the future. The one case they do cite, I might be mispronouncing this, was a remand of a Secretary of State decision, which was a revocation of a dealer's license. The issue was when they were challenging it, with that license you could each year apply for a new license. In that case there was no speculation. The statute at issue, if you look at the fact section of the case, specifically directed that when they give the new license, when they consider it, they specifically consider whether or not there was a prior revocation and specifically whether or not there were findings involved. And furthermore, in fact, the Secretary of State had denied the license and explicitly denied the license on the basis of that prior revocation. So there wasn't any speculation in that case. Here they just want, they're now free. The suspension was given for a two-year period. It's expired. There is no reason to think that it's going to prevent them from bidding in the future or from winning an award in the future. What about their basic argument, though, that the Court erred in finding it couldn't even review the decision, that it was a totally discretionary decision and quashed the writ of certiorari after a seven-day trial at the Department of Transportation? Yes, Your Honor. Our position is that it is not subject to judicial review. That's what the Circuit Court's finding was below. It's because it does have there are adjudicatory elements, Your Honor. We don't dispute that. There's a hearing. There's evidence taken. But that's true in the main case we rely on, the Supreme Court case of Hanrahan v. Williams that looked at the parole board decision. There was a right to a hearing in that case. If you had the hearing, the parole board was specifically under the statute, under the criminal code I believe it is, directed to take witnesses, take and consider certain statements and other certain reports, look at certain evidence. Yet in that case it was found that the broad discretion that was conferred on the board didn't cabin them with the objective standards necessary for judicial review. But the procurement code itself says that determinations made by a chief procurement officer are final and conclusive unless they are clearly erroneous, arbitrary, capricious, or contrary to law. Well, who would make that determination? Well, it doesn't specifically, that first act of provision doesn't specifically state or even instate that it's going to be judicial review. It could be an internal review. It could be the CPO himself or the secretary. But in addition also it says except as otherwise provided in the code. And we argue that there are other portions of the code that say that there is no right to a contract. There is no right to bid on a contract. And so it's conferring this broad discretion on the CPO. We think that between the two. Well, subject to a standard that the decision not be arbitrary, capricious, or contrary to law. And when the IDOT doesn't engage in the administrative procedure rules that generally govern administrative review, then the only way to proceed for BROSS is by writ of certiorari, isn't it? That is, yes, I believe that would be the only way to go. And we do also recognize that you still can make certain claims of illegality with the writ. We don't think there's nothing you can do, for instance, that it violates the Constitution under the Equal Protection Clause or that it would be illegal due to fraud or corruption. There are still, we still believe that that, it's the Bigelow case I think we cite, that those are still, that route is still available. But still when you have a broad discretionary decision over the decision about awarding a contract such as this, we believe that those are not subject to judicial review. Well, it's not about the decision to award the contract. It was the decision to suspend the bidder from pursuing future contracts that is subject to review. Not the award of the contract, but the decision to suspend. Isn't that a difference? There is a difference, but we believe still that they're not the same, that ultimately the suspension decision is a decision about the awarding of contracts over a specified period of time. It's not like an usual suspension, I'm sorry. The hearing officer had to find that there was cause to support the suspension. Correct, Your Honor. It does provide, it does require a cause although it's not a cost standard that's been developed in the law like a just cause standard for employment. And though it's really, it is left to the discretion it's left to the discretion of the CPO to decide what cause means in the regulations. He's done that and created a standard which is acts or omissions which indicate a lack of business integrity or honesty. You're saying that's not even reviewable? We think that that's not subject to review, correct, Your Honor. Now if the court disagrees, as counsel explained from Chester Bras, the court can remand the decision back to the circuit court to review the merits or since Chester Bras has asked this court to review the merits in the case and since you are really reviewing the CPO's decision, we agree that the court could in that circumstance decide to review it itself. And if it does though, it should still affirm the CPO's decision because it's neither arbitrary or capricious or against a manifest weight of evidence. That's the standards that generally apply to sanction decisions. So if this court really thinks the discretion is caverned by certain by objective standards, then it should apply that same standard. The very cases they cite such as the Appleton case or Applegate case applied the arbitrary and capricious standard although also the manifest weight to the extent it's relying on factual findings. And also the claims, the factual findings which are issued here that the CPO made whether or not labors were used on the Adams Project site, whether or not there are material misrepresentations. These are all as we cite to the cases in our brief, these are all kind of factual decisions usually left to the manifest weight of evidence standard. If the court believes it clearly applies to some of the issues or any of the issues, we still think that the CPO's decision should be affirmed under, it's still a very broad discretionary standard of review that the CPO made. Now just as a threshold matter with the substantive decision, the CPO found three separate bases or three separate by acts or omissions or categories of acts and omissions which supported the suspension. And Chester Bross has never argued that any one of them wouldn't be sufficient to support a two year suspension. So if the court even were to find for instance for some reason disagreed with whether or not there was participation of the heavy equipment operators, there still is, there was the finding that they used labors on the Adams Project but didn't participate in an applicable apprenticeship program. There is the finding that they made material misrepresentations regarding the use of labors. And then there's also the findings that they made material misrepresentations regarding the participation in a program for their heavy equipment operators. With regard to the use of labors on the Adams Project, there was evidence that the it was inferences based on Chester Bross' own documents. It was their own September 2010 payroll that identified three of their employees as labors. It was the other, the documents for the federal, nearby federally funded, also asphalt paving work programs, sorry, construction projects, where they identified, those were federally funded and so not subject to the responsible bidder provision issue here. In that case, in those cases, they identified one of them, half of their employees as labors, the other one-third of their employees as labors. And furthermore actually, there's the evidence in the record is that documentation on the federally funded projects, the specific employees who were identified as labors were some of the employees who were on the Adams Project, including two of the employees who were identified in that September 2010 payroll as labors. Based on these, the Prima Fiscia found that the, sorry, that the, I documented a Prima Fiscia case that they'd used labors on the project. Indeed, the only kind of evidence that they came forward to say they didn't use it, only further supported, really further supported their use of labors. That is, they tried to argue that, hey, just because we say labors in our payroll for purposes of the Prevailing Wage Act, that doesn't mean that we meant labors for purposes of the Responsible Bidder provision. However, their argument, the evidence they put forward on that is that in the counties, usually they identify what they call traffic safety as part of labors, but they also feel that that would be used as labors under the apprenticeship programs as well, that everyone considers that labor one of the various tasks of labors. So that it just shows that whichever statute you're working under it's the same tasks at hand. They try to make the argument that there's some counties, minority counties, which actually create a separate division of craft for the Prevailing Wage Act of traffic safety control, but they never argue that that's actually true in the Adams Project, which is Adams County, which is where the Adams Project was here. And even if it did, it wouldn't matter. It wouldn't show that it was, that when you, all that would show is that there was another, that there was other, still would show that when you identify under the Prevailing Wage Act that the kinds of tasks you're looking at are the kind of tasks which everyone counts as labors. That's no evidence that they're using it to show tasks which aren't labors. They also, there is no dispute, they didn't participate in a program that was approved for labors. That is the Responsible Bidder Provision and Item K, which they signed on to, they were certifying that they had that they were participating in the approved USDOL programs, training programs for the crafts they were using. Instead what they come back and argue is that hey there might have been the tasks that our people might have been doing on the Adams Project might have been covered in the Heavy Equipment Operator Program, which they claim to have participated in. However, they put forward no evidence of the tasks that were being used, that were being conducted on the Adams Project. For that reason alone, CPO rejected this argument. In addition they never had any specific evidence of what was really being covered in their Heavy Equipment Operator training program. Indeed, the testimony by ABC's president, ABC was the sponsorship organization which runs the training program for Heavy Equipment Operators. She did not know how the training in her program for operators would compare to a USDOL approved program for labors. She had no idea. Who had the burden of proof in the suspension hearing? IDOT had the burden of proof to show that, but it still that's the ultimate burden of proof in showing, in meeting the adequate evidence to show that there was a violation or an act or omission. But still, once there was a prima facie case, even if they didn't have the burden to prove, they didn't have to put forward any evidence showing that they actually participated at all in the program. They simply said, theoretically there could be a program out there that would cover the same kinds of tasks, a program that was not a labor program that would cover the same kinds of tasks that some labor somewhere might apply or might use. I see my time is running out. I want to get on to the operator. It was also that they did certify that they were using Heavy Equipment Operators. They did make a specific representation about the use of Heavy Equipment Operators and their participation. That is, in their bid documents, in item K, they attached documents and they specifically referenced in certifying item K that see the attached documents at record page 2015, they have a letter from themselves where they specifically explain, we are going to meet the requirements of the Responsible Bidder Provision by having our employees pre-registered with ABC in the training programs for the following trades. They list three trades, none of which are labor, but one of which is Heavy Equipment Operators. So they made a specific representation that they were complying with the participation requirement by having their employees pre-registered to go into the program for operators. Now, the CPO rejected their argument that they participated by merely being a member in the sponsorship organization and never having sent any of their employees to the program. This was based in part simply that this is an unreasonable interpretation of what participation means or application of what participation means. To participate means to take part in an activity. The very purpose of the Responsible Bidder Provision is to ensure that you have trained workers on the site who are trained in the specific crafts that they are providing. If under their reading and their application of the Responsible Bidder Program, you could have and in this case did have, you could have a construction company which never sends anybody into the training program. I see my times right now. So we ask that the Court dismiss the appeal as moot or in the alternative, affirm the CPO's decision. Thank you. Thank you. Rebuttal. Yes, just briefly a comment on some of the arguments Council made. With respect to the standards that are in the Procurement Code and the Administrative Code that govern suspensions, Council suggests that this is just something like the finding of just cause or determining whether the rulings were clearly erroneous, arbitrary, and capricious are something that IDOT can review internally. Well, if it's reviewed internally, it really just makes those standards. We've got somebody else to take a second look to see if IDOT has complied with those standards in imposing suspensions. Also, with respect to the work that was being performed at the Adams County site, IDOT is attempting to shift the burden to the contractor to prove that it, it's sort of working backwards instead of proving that we made some sort of misrepresentation as to what was actually done. They're assuming that we were using laborers and that we have to prove that we were not using laborers. And without any evidence of what was actually being, what kind of work was being performed by the Chester Brass employees, which they can't prove that we made a misrepresentation as to our participation in an apprenticeship program for those type of workers. Finally, Council made a statement about a letter that was attached to the bid documents about a preregistration of, into the apprenticeship program for ABCI Illinois of certain workers. And he stated that by doing so we made a misrepresentation that we complied with the requirement of participation. Well, a preregistration is not participation that you have to have actual enrollment in the program. But then saying somebody's preregistered wouldn't be a misrepresentation if it doesn't mean participation. Unless anyone has any further questions. I will again ask that you reverse the chalkboard. I take this matter under advisement. We will stand at recess until 1 o'clock.